IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>DEMARCO DOXIE,<br><br>Defendant. | CRIMINAL INDICTMENT<br><br>NO. 1:13-CR-101-WSD-GGB |

### FINAL REPORT AND RECOMMENDATION

Defendant Demarco Doxie ("Doxie") is charged in a second superseding indictment with multiple counts of mail fraud and wire fraud. He is also charged with four counts of filing a false tax return. Pending before this court is Doxie's Motion to Suppress Statements (Doc. 33) and Motion to Suppress Evidence (Doc. 41). An evidentiary hearing on these motions was held before me on March 6, 2014. All transcript references are to the transcript of that hearing.

### I.  FACTS

The mail and wire fraud charges stem from Doxie's employment with Ennis Traffic Safety Solutions ("Ennis"), a company that manufactures and sells road marking and pavement surface treatments.  Doxie was an Environmental Health and Safety manager at Ennis from January 2007 through August 2011.  The indictment

charges that Doxie engaged in two schemes to defraud Ennis between June 2007 and August 2011. (Doc. 47).

The first alleged scheme related to a company called Outlook Environmental & Safety Solutions, LLC. ("Outlook"). The indictment charges that (1) Doxie was responsible for hiring outside vendors to perform environmental work for Ennis; (2) Doxie approved Outlook as one of Ennis's outside vendors; (3) unbeknownst to Ennis, Doxie was the owner and only employee of Outlook; (4) Doxie created fictitious invoices for environmental work that Outlook had purportedly performed for Ennis when in fact Outlook had not performed any work for Ennis; and (5) Doxie submitted fraudulent invoices from Outlook to Ennis and Ennis paid the invoices. (Doc. 47, ¶ 3).

The indictment also alleges that Doxie made fraudulent charges to his company-issued American Express and JP Morgan Chase credit cards. (Doc. 47, ¶¶ 7-12). Doxie was supposed to use these cards only for necessary corporate expenses, but according to the indictment, he placed numerous personal charges on both cards. (Id. ¶¶ 11-12). The indictment further alleges that Doxie used the American Express card to make payments to his company, Outlook, even though

2

Outlook had not performed any work for Ennis that justified those charges. (Id. ¶ 7(b)).

The pending motions relate to a series of communications between Ennis's counsel and Doxie's counsel. In August of 2011, Ennis became concerned about possible embezzlement by Doxie. (Tr. 59). Ennis hired attorney Kenneth Broodo ("Broodo") to investigate Doxie's conduct and to convince Doxie to pay for the unauthorized credit card charges. (Id.; Gov. Ex. K). Doxie became aware of Broodo's investigation and hired attorney Alan Kan ("Kan") to represent him. (Tr. 7-8). Kan practices in the fields of civil litigation and corporate business related matters. (Tr. 6). Kan was hired to protect Doxie from any civil liability. He did not view his role as in any way related to potential criminal charges. (Tr. 34).

Kan and Broodo exchanged a series of emails in August and September of 2011. The relevant portions of that correspondence are summarized or quoted below:

• On August 26, 2011, Broodo wrote to Kan informing him that he represented Ennis "with regard to the issues involving" Doxie. Broodo included a list of alleged unauthorized credit card charges made by Doxie on Ennis's credit cards. Broodo demanded payment of the charges. (Gov. Ex. K)

3

- Also on August 26, 2011, Broodo wrote to confirm a conversation that had taken place between the attorneys on August 23, 2011.  Before summarizing the August 23rd conversation Broodo wrote: "While Ennis Paint reserves the right to take legal action, and does not in any way concede your client's version of the facts, the Company first wants to more clearly understand your client's position before deciding on a course of action."  Broodo requested information and a signed statement from Doxie related to the Outlook and credit card matters. (Gov. Ex. B);

- Another letter on August 26, 2011 from Broodo to Kan warned that Doxie's "admitted conduct has exposed him to the possibility of very serious legal consequences; stated that Ennis was investigating the matter and was seeking Doxie's cooperation in "understanding the facts and in righting any wrongs that were committed", and demanded that Doxie and his wife preserve all relevant materials and their assets and provide an accounting of the same to Ennis.  (Gov. Ex. C);

- On August 29, 2011, Broodo wrote to Kan confirming their conversation in which Kan acknowledged receiving the three letters sent on August 29th, confirming that Kan would provide Broodo with Doxie's signed statement with

4

his version of the facts and additional information.  In his closing paragraph, Broodo wrote, "While Ennis Paint reserves all of its rights, your client's continued cooperation is appreciated."  (Gov. Ex. D);

- On the same date, Kan wrote back that he would be providing information and documents later in the week.  He wrote: "As we discussed, we understand Ennis' concerns and want to cooperate as much as possible.  However, we expect that once we get to the bottom of this matter and nothing comes from it, that your client will be willing to execute a mutual release and non-disclosure agreement relating to my client's employment at Ennis. (Gov. Ex. F at KAN-000130);

- On September 2, 2011, Kan sent to Broodo a written explanation of the charges made on Doxie's company credit card.  He contended that some of the charges were for company business.  Kan wrote that the correspondence represented "an offer of compromise and settlement of a disputed matter and shall not be admissible in any future litigation."  (Gov. Ex. E);

- On the same date, Broodo wrote back.  In his letter he stated, "As I mentioned on the phone, Ennis Paint's focus at this point is on reviewing the facts and it does not consider our communications to be settlement negotiations, but rather

5

a voluntary exchange of information. Ennis Paint reserves all rights." (Gov. Ex. F at KAN-000127);

- On September 9, 2011, Kan wrote to Broodo attaching a detailed statement from Doxie explaining his use of Outlook. (Gov. Ex. G). Kan conveyed Doxie's position that Outlook had legitimately provided services to Ennis. (Tr. 48). Both the cover email from Kan and Doxie's statement included language that the statement represented an offer of compromise and settlement and should not be admissible in any future litigation. (Gov. Ex. G at KAN-000133-34);

- On the same date, Broodo wrote back stating "Ennis Paint's focus at this point is on reviewing the facts and it does not consider our communications to be settlement negotiations, but rather is a voluntary exchange of information, Ennis Paint reserves all rights." (Gov. Ex. H);

- On September 15, 2011, Kan again wrote to Broodo with more information and included the same language that was in his previous communications that the "correspondence represented an offer of compromise and settlement of a disputed matter . . . ." (Gov. Ex. I).

6

After the September 15th correspondence, Broodo told Kan that he wanted Doxie to repay American Express in the range of $60,000 to $70,000. (Tr. 50-51). Doxie was unable to do so and communications between the attorneys did not continue. (Tr. 51).

During the period that the attorneys were exchanging correspondence, they were also speaking to each other. Kan made clear to Broodo that he was trying to settle the dispute between Ennis and Doxie. (Tr. 13, 26-27, 44). Broodo told Kan that before any type of settlement or compromise could be considered, he would need full information about what had occurred. (Tr. 9-10, 13, 17, 19, 23, 43, 49). Kan viewed Broodo's repeated statement that Ennis did not consider their communications to be settlement negotiations to mean that Ennis did not want to be committed to a particular course of action. (Tr. 25, 27, 43). Kan believed that Ennis would be open to the possibility of a settlement if the company was satisfied with Doxie's cooperation. (Tr. 43).

Broodo viewed his role as conducting an investigation about Doxie's potential embezzlement from Ennis. (Tr. 62, 67). He was attempting to get cooperation from Doxie, but did not consider his communications with Kan to be settlement negotiations. (Tr. 62). However, Broodo conceded that settlement negotiations would have been possible once he had obtained all of the information that he sought from

7

Doxie.  (Tr. 81-82).  Broodo believed that Doxie was cooperating in order to "try to fix" the wrong that he had committed.  (Tr. 106).

Broodo was not working with law enforcement during his investigation. (See Tr. 74-75).  He did not conclude that criminal acts had probably occurred until after he had finished the investigation.  (Tr. 102).  He then turned over the information that he had gathered to the FBI.  (Tr. 74-75).  Broodo had conducted employee embezzlement investigations in the past and had provided information to law enforcement on those occasions.  (Tr. 99-100).

The government now proposes to use as evidence in the criminal case the statements and evidence given by Kan to Broodo.  Doxie moves to exclude those statements and evidence based on Fed. R.Evid. 408.  Doxie also contends that Broodo was acting as an agent for the government and that he unreasonably seized the statements and documentation in violation of the Fourth Amendment.   (Doc. 58 at 9-11).

## II. DISCUSSION

### A. Application of Rule 408

Doxie contends that all of the statements that he or his attorney made or provided to Broodo should be excluded under Rule 408 of the Federal Rules of Evidence. Rule 408 provides in pertinent part:

> Evidence of the following is not admissible—on behalf of any party—either to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction: (1) furnishing, promising, or offering—or accepting, promising to accept, or offering to accept—a valuable consideration in compromising or attempting to compromise the claim; and (2) conduct or a statement made during compromise negotiations about the claim—except when offered in a criminal case and when the negotiations related to a claim by a public office in the exercise of its regulatory, investigative, or enforcement authority.

Fed.R.Evid. 408. In the Eleventh Circuit, Rule 408 applies to criminal cases. United States v. Arias, 431 F.3d 1327, 1336-37 (11th Cir. 2005); see also Fed.R.Evid. 408, Notes to 2006 Amendment (stating that settlement discussions are not admissible in a criminal case unless the statements were made to a government entity). The question for the Court is whether Rule 408 applies to this particular case.

Rule 408 excludes factual statements of various kinds made during compromise negotiations of civil matters. The Rule is designed to encourage civil settlements by fostering free and full discussion of the issues. Blu-J, Inc. v. Kemper

9

C.P.A. Group, 916 F.2d 637, 642 (11th Cir. 1990). The test for whether statements fall under this Rule 408 is "'whether the statements or conduct were intended to be part of the negotiations toward compromise.'" Ramada Dev. Co. v. Rauch, 644 F.2d 1097, 1106 (5th Cir. Unit B May 1981) (quoting 2 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 408[03], at 408–20 to –21 (1980)); see also Blu-J, Inc, 916 F.2d at 642 (same). In making that determination, the Court must look at the totality of the evidence. See Raybestos Prods. Co. v. Younger, 54 F.3d 1234, 1241 (7th Cir. 1995) ("To determine whether [the defendant] sent his letter as an attempt to compromise a claim . . . this court must look at the totality of the circumstances, carefully reviewing the contents of the letter and the timing of its delivery.").

The government's primary argument is that Doxie's statements were not made during the course of settlement negotiations, but rather, "were made to mislead the company into believing that no fraud had taken place." (Doc. 59 at 9). This argument is puzzling and not helpful. Surely, the government's attorney knows that the court cannot assume for purposes of this ruling that Doxie is guilty of the fraud charged in the indictment. Moreover, the government presented no evidence of Doxie's guilt at the evidentiary hearing, and the factual statements in the government's brief describing Doxie's fraudulent conduct are not supported by any

10

evidence in (or citations to) the record. (See Doc. 59 at 2-3). The government does not argue that the statements are to be used for any purpose other than proving Doxie's guilt, which, in the context of a criminal case is his "liability." Cf. United States v. Davis, 596 F.3d 852, 860 (D.C. Cir. 2010). Therefore, the government's argument is rejected.

Regardless of Doxie's guilt or innocence, the issue for the Court is whether the statements submitted by Doxie's attorney were intended to be a part of negotiations towards compromise of a civil dispute. See Blu-J, Inc. 916 F.2d at 642; Ramada Dev. Co., 644 F. 2d at 1106. There is no question that the parties were in a civil dispute. Ennis believed that Doxie owed it money for the personal charges on credit card and the false invoices from Outlook. In fact, Broodo's first email to Kan was a demand for payment of credit card charges that Doxie had not paid. (Gov. Ex. K). In response, Doxie contended that some of the credit card charges that Ennis listed as personal were for company business. (Gov. Ex. E at KAN-000125-26). Doxie also contended that the Outlook invoices were legitimate. (Gov. Ex. G).

The next question is whether Broodo and Kan sent their communications for the purpose of settling the dispute. As a preliminary matter, I note that it does not matter that the statements involved were not actually offers but rather facts proffered

11

about the dispute. Rule 408 covers all conduct and statements during negotiation including the facts disclosed to promote a settlement. See Weinstein's § 408.05[2] ("To promote settlement of disputes, there must be full and frank disclosure by each party of his or her position, and the facts on which he or she relies to sustain that position."); Blu-J, 916 F.2d at 642 (trial court properly excluded evidence relating to independent evaluation of defendant's accounting practices prepared by agreement of the parties since the evidence was intended to be part of negotiations toward compromise; citing Weinstein's); Ramada Dev. Co., 644 F.2d at 1106-07 (trial court properly excluded a report by an architect that was intended to function as a basis for settlement negotiations regarding alleged defects in motel); Lyondell Chem. Co. v. Occidental Chem. Corp., 608 F.3d 284, 295 (5th Cir. 2010) (stating that Rule 408 "extends to legal conclusions, factual statements, internal memoranda, and the work of non-lawyers and lawyers alike" so long as the communications were meant to be part of compromise negotiations).

The evidence supports Doxie's argument that Kan provided the statements to Broodo for the purpose of settling the civil dispute between Doxie and Ennis. Kan's characterization of his correspondence as an "offer of compromise . . ." is not controlling. See Cassino v. Reichhold Chemicals, Inc., 817 F.2d 1338, 1343 (9th Cir.

12

AO 72A
(Rev.8/82)

1987) ( "Rule 408 should not be used to bar relevant evidence . . . simply because one party calls its communication with the other party a 'settlement offer.'"); Bank of America N.A. v. Sea-ya Enters., LLC, 872 F.Supp.2d 359, 364 (D. Del. 2012) (concluding that Rule 408 did not cover defendants' letter, even though it was labeled an offer of compromise, because defendants actually did not dispute any of the plaintiff's claims).  Nevertheless, Kan testified that the statements were provided with the goal of settling the dispute, (see Tr. 13, 26-27, 44), and his testimony is consistent with the correspondence between Kan and Broodo and the logical inferences drawn from the circumstances.

The government apparently contends that the intent to negotiate a compromise has to be mutual and that Broodo never had the intent to negotiate with Doxie. However, Rule 408 provides that offers to settle are excluded even if no additional negotiations follow. Fed.R.Evid. 408(a); see Davis, 596 F.3d at 859 ("If one party attempts to initiate negotiations with a settlement offer, the offer is excluded from evidence even if the counterparty responds: 'I'm not negotiating with you.' See Fed.R.Evid. 408 advisory committee's note (1972 proposed rule).  It makes no sense to force the party who initiates negotiations to do so at his peril."); Ramada Dev. Co., 644 F.2d at 1107 ("[Rule 408] does not indicate that there must be a pre-trial

13

understanding or agreement between the parties" as to whether the evidence was furnished for the purpose of compromise); Polk v. BP Amoco Chem. Co., 586 F.Supp.2d 619, 621-22 (D.S.C. 2008) (concluding that a letter from the defendant outlining the defendant's position was covered by Rule 408, even though the plaintiff never made any settlement offer of his own and never expressed any willingness to settle for less than the full amount of his claim).

Even assuming *arguendo* that intent has to be mutual in order for Rule 408 to apply, I find that Broodo was open to the possibility of a settlement. Although several of his letters contained the statement: "[Ennis] does not consider our communications to be settlement negotiations, but rather . . . a voluntary exchange of information, Ennis Paint reserves all rights," (See Gov. Ex. F at KAN-000127; Gov. Ex. H), the labels that a party places on his correspondence are not controlling. See Cassino, 817 F.2d at 1343; Sea-ya Enters., LLC, 872 F.Supp.2d at 364. Moreover, Broodo's repeated statement is not necessarily inconsistent with the application of Rule 408. The communications themselves do not have to be settlement negotiations to fall under the ambit of Rule 408. As discussed above, the rule is broad enough to protect a voluntary exchange of information that is for the purpose of investigating the possibility a settlement. See Blu-J, 916 F.2d at 642; Ramada Dev. Co., 644 F.2d

14

at 1106-07; Weinstein's § 408.05[2].  Moreover,  a voluntary exchange of information protected under the rule is not inconsistent with a party reserving all of its "rights."  Obviously, a party that engages in settlement discussions always has the right to withdraw from those discussions and proceed with litigation.  It is not clear what other right Ennis was seeking to reserve by its statement.

In any event, I find that Broodo had the requisite intent, despite his expressed refusal to characterize the attorneys' communications with each other as settlement negotiations.  It is not unusual for civil negotiations to begin with one side refusing to make any concessions before receiving evidence from the other side.  As the Sixth Circuit has commented:

> A party will often adopt a hardline position at the beginning of negotiations in order to extract greater concessions from an opponent. It would ignore the realities of negotiation to hold that such a position necessarily means that the parties are not engaged in compromise negotiations. Such a rule would also run contrary to the purposes of Rule 408, as it would invite undue caution in settlement negotiations, and would facilitate the admission of communications that contain puffing, posturing, and various irrelevancies.

Eid v. Saint-Gobain Abrasives, Inc., 377 F.App'x. 438, 444 (6th Cir. 2010).

At an early stage in their correspondence, Broodo told Kan that Ennis wanted to understand Doxie's position before deciding on a course of action.  (Gov. Ex. B). The logical implication of that communication was that Broodo was open to

15

discussion about settlement in lieu of filing suit if he was satisfied with Kan's submissions to him. In fact, at the hearing Broodo admitted that settlement was possible after he had gathered all of the relevant facts. (Tr. 81-82). Also, Broodo's statement to Kan that he wanted Doxie's information for the purpose of "righting any wrongs that were committed" implied that Broodo was considering using the information provided by Kan to settle their dispute. (See Gov. Ex. C).

The cases cited by the government are all distinguishable and do not support a different result. In Sea-ya Enters., LLC, 872 F. Supp. 2d at 363-64, the trial court admitted a series of letters in which Defendants admitted their debts but requested an accommodation on repayment. The District Court ruled that this was not a "dispute" that was being negotiated under Rule 408; the parties agreed that Defendants owed the money, and Defendants' letters were simply a "plea for mercy." Id. By contrast, in this case, there was a genuine dispute between the parties as to whether the credit card charges and the Outlook invoices were valid. Similarly, in U. S. v. Christou, Case No. 1:06-cr-483-WSD, 2008 WL 488878 at *5 (N. D. Ga. Feb. 20, 2008), this Court held that Rule 408 did not apply because there was no claim that was disputed as to validity or amount. In the current case, Doxie disputed the validity and amounts of his alleged debts.

16

In Rodriguez-Garcia v. Municipality of Caguas, 495 F.3d 1, 11-12 (1st Cir. 2007), Plaintiff's attorney sent a letter that gave Defendant notice of an employment claim in compliance with pre-litigation notice requirements. Defendant's human resources department then sent a letter to Plaintiff acknowledging notice of the claim and expressing a willingness to grant Plaintiff's request for reinstatement to her position with the company. Id. at 12. The First Circuit ruled that neither of these letters represented an attempt to compromise on a claim. Id. at 11-12. The first letter was simply Plaintiff's notice of her claim, and the second letter could not be considered part of compromise negotiations because the Defendant agreed to give Plaintiff everything that she wanted. Id. Here, by contrast, Kan was trying to bridge a gap between Doxie's position and that of Ennis; he was trying to settle a genuine dispute.

Finally, in United States v. Meadows, 598 F.2d 984, 988-89 (5th Cir. 1979), the Court made the unremarkable holding that the prosecution's use of a direct admission with respect to the defendant's intent when he was interviewed by his government employer in an informal investigation about the defendant's receipt of erroneously issued checks did not implicate Rule 408. There was no evidence that the defendant was attempting to compromise or negotiate with the government when he

17

made the statement. Id. at 989. Here, as described above, Doxie and Kan were trying to settle a dispute when they provided the information to Ennis and Broodo. I recommend that those communications be excluded from evidence under Rule 408.

### B. Alleged Fourth Amendment Violation

Doxie also argues that the Fourth Amendment was violated by Broodo's "seizure" of his statements and evidence. (Doc. 58 at 9-11). This argument is without merit. A search by a private person does not implicate the Fourth Amendment unless the person acts as an instrument or agent of the government. United States v. Ford, 765 F.2d 1088, 1089-90 (11th Cir. 1985). Courts look at two factors when determining if a private person should be regarded as a government agent: "(1) whether the government knew of and acquiesced in the intrusive conduct, and (2) whether the private actor's purpose was to assist law enforcement efforts rather than to further his own ends." United States v. Steiger, 318 F.3d 1039, 1045 (11th Cir. 2003).

Here, there is no evidence that the government had any knowledge of the alleged embezzlement until after Broodo completed his investigation. In addition, Broodo was acting to further the interests of his private client, Ennis Paint, rather than the interests of law enforcement. It was not until the conclusion of his investigation

18

that he decided that a crime had been committed and that law enforcement should be contacted. Thus, Broodo cannot be considered a government agent for purposes of the Fourth Amendment. See Steiger, 318 F.3d at 1045.

Doxie observes that Broodo had provided information to law enforcement in the past, but Broodo's history does not change the Fourth Amendment analysis. The issue is whether law enforcement somehow instigated or influenced this particular investigation. Since the FBI had no knowledge of Broodo's conduct until after the fact, and since Broodo acted to further the purposes of his private employer rather than those of law enforcement, there was no unconstitutional search or seizure.

### III. CONCLUSION

As discussed above, Doxie's motions are based on both Fed. R.Evid. 408 and the Fourth Amendment. Because the arguments under Fed. R.Evid. 408 do not relate to any conduct by law enforcement or constitutional right, they are more properly called Motions to Exclude. Accordingly, I direct the Clerk to rename the pending motions as "Motion to Exclude and Suppress Statements" (Doc. 33) and "Motion to Exclude and Suppress Evidence" (Doc. 41). (To the extent the motion relies on Fed. R.Evid. 408 it will be deemed a Motion to Exclude. To the extent the motion relies on the Fourth Amendment, it will be deemed a Motion to Suppress.)

For reasons discussed above, I **RECOMMEND** that Doxie's Motion to Exclude and Suppress Statements (Doc. 33) and Motion to Exclude and Suppress Evidence (Doc. 41) be **GRANTED IN PART AND DENIED IN PART.**  I recommend that the statements and evidence be excluded under Fed. R.Evid. 408, but not suppressed under the Fourth Amendment.

There are no pending matters before me, and I am aware of no problems relating to the scheduling of this case for trial.  It is therefore **ORDERED AND ADJUDGED** that this action be declared **READY FOR TRIAL**.

It is so **ORDERED** and **RECOMMENDED**, this  18th   day of June, 2014.

*Gerrilyn G. Brill*
GERRILYN G. BRILL
UNITED STATES MAGISTRATE JUDGE

AO 72A
(Rev.8/82)